# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

CALVIN O. TANKESLY, JR.,      )
                            )
      Petitioner,         )         **CASE NO. 3:06-0543**
                            )         **JUDGE HAYNES**
v.                       )
                            )
TOMMY MILLS, Warden,      )
                            )
      Respondent.       )

## M E M O R A N D U M

Petitioner Calvin O. Tankesly, Jr., filed this pro se action under 28 U.S.C. § 2254 seeking

the writ of habeas corpus to set aside his state convictions for rape of a child and attempted rape

of a child for which he received two consecutive life sentences without parole. After review of

the petition, the Court appointed the Federal Public Defender. This action was held in abeyance

pending Petitioner's exhaustion of his state court remedies, but those remedies have since been

exhausted. In his amended petition, the Petitioner asserts the following claims[1]:

> 1: In violation of the Sixth and Fourteenth Amendments to the United States
> Constitution, counsel rendered ineffective assistance;
>
> 2: In violation of the Fourth, Sixth, and Fourteenth Amendments to the United
> States Constitution, the State presented improperly seized evidence from
> Petitioner's residence;
>
> 3: In violation of the Sixth and Fourteenth Amendments to the United States
> Constitution, the trial judge allowed into evidence women's undergarments
> officials seized from Petitioner's residence and vehicle;

---

[1] The amended petition incorporates the pro se petition without any legal analysis. Mayle v.
Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 cases. Under Fed. R.
Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v.
Tarrant county, 798 f.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended
petition to supersede the pro se petition and the claims therein. Unless adopted and supported by
legal memorandum, the Court deems those claims to be waived.

4: In violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, the trial court ruled that the State could, and the State did, present identification testimony;

5: In violation of the Sixth and Fourteenth Amendments to the United States Constitution, the state knowingly presented false testimony by a police detective;

6: In violation of the Sixth and Fourteenth Amendments to the United States Constitution, the trial judge precluded Petitioner from presenting his defense;

7: In violation of the Sixth and Fourteenth Amendments to the United States Constitution, the State withheld material and exculpatory evidence;

8: In violation of the Sixth and Fourteenth Amendments to the United States Constitution, in closing argument the assistant district attorney vouched for the victim's credibility;

9: The trial court's instructions and the trial court's failure to give instructions on lesser offenses violated the Sixth and Fourteenth Amendments to the United States Constitution;

10: A juror engaged in misconduct in violation of the Sixth and Fourteenth Amendments to the United States Constitution;

11: The trial court sentence of Petitioner violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and

12: The cumulative effect of constitutional errors renders Petitioner's convictions and/or sentences unconstitutional.

(Docket Entry No. 37 at 7-10).

Before the Court is the Petitioner's motion for summary judgment (Docket Entry No. 61) and Respondent's motion to dismiss (Docket Entry No. 67). In his motion for summary judgment, Petitioner contends that his counsel failed to move to suppress certain evidence and rendered ineffective assistance to Petitioner at trial by that failure. (Docket Entry No. 62, Memorandum at 5-12). In a supplemental brief, Petitioner also challenged his trial counsel's failure to introduce proof of the non-identification of Petitioner by a witness and to present Jerry

Dean as an alternative suspect; counsel's failure to request a lesser included offense instruction; and counsel's failure to provide adequate assistance at Petitioner's sentencing.

In his motion to dismiss, Respondent argues that, in sum that the state courts' decisions on Petitioner's claims were reasonable applications of federal law.

## A. Review of the State Record

### 1. Procedural History

A jury convicted Petitioner of rape of a child and attempted rape of a child and on appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentence. State v. Calvin Otis Tanksley, No. M1998-00683-CCA-R3-CD, 2000 WL 1521475 (Tenn. Crim. App. Oct. 4, 2000). Tennessee Supreme Court denied Petitioner's application for permission to appeal May 21, 2001. Id.

Petitioner then filed a petition for state post-conviction relief and later a petition for writ of error coram nobis. The state trial court denied the petition for writ of error coram nobis asserting a claim of juror misconduct. (Docket Entry No. 30-21 at 52-56). Later, Petitioner's post-conviction petition was denied. On appeal, the Tennessee Court of Criminal Appeals affirmed the denial of the petition for writ of error coram nobis, Calvin O. Tankesly v. State, No. M2004-01440-CCA-R3-CO, 2005 WL 2008203 (Tenn. Crim. App. Aug. 19, 2005) (app. denied Feb. 6, 2006) and later, denied the petition for post-conviction relief. Calvin Otis Tankesly v. State, No. M2005-02008-CCA-R3-PC, 2007 WL 1890208 (Tenn. Crim. App. June 28, 2007).

### 2. Review of the State Record

On Petitioner's direct appeal, the Tennessee Court of Criminal Appeals set forth findings

of fact[2] underlying Petitioner's convictions.

> On May 6, 1995, Tanya Briggs gave her six-year-old niece, B.B., some change
> and asked her to go purchase a soft drink from a machine located inside the
> laundry room of her apartment complex. As B.B. entered the laundry room, she
> encountered [Petitioner] who asked her "Do you want any panties?" [Petitioner]
> then grabbed B.B., put his hand over her mouth, and placed her on the floor. He
> pulled B.B.'s shorts and panties down and proceeded to digitally penetrate B.B.'s
> vagina. [Petitioner] next attempted to make B.B. perform oral sex upon him. He
> placed his penis on B.B.'s lips, but she never opened her mouth. [Petitioner] stood
> B.B. up and she urinated on herself. When he saw through the laundry room
> windows that two people were about to enter the building, he placed B.B. back on
> the floor, told her to pull her pants up, and immediately left the laundry room.

> Kimberly Gilkeson and her husband, Jimmy Gilkeson, lived in the same
> apartment complex and had just parked directly in front of the laundry room.
> Kimberly parked her car beside [Petitioner's] car, which was backed into the
> parking spot. Both Kimberly and Jimmy immediately noticed a young blond-
> headed male child, buckled into a car seat, in [Petitioner's]
> car. As Kimberly was attempting to exit her car, [Petitioner] walked out of the
> building. Due to the position of Kimberly's car in relation to [Petitioner's] car,
> Kimberly had to wait for [Petitioner] to get into his car before she could exit her
> vehicle. The rapist said "hello" or "something like that" to Kimberly, got in his
> car, and left. Kimberly testified that she made eye contact with [Petitioner] and
> observed him for approximately 15 seconds.

> Kimberly, followed shortly thereafter by her husband, proceeded into the laundry
> room. When she entered the facility, she found B.B. "hysterically crying and
> upset." B.B. repeatedly told Kimberly and her husband that "that man tried to kill
> me." B.B.'s hair was "real disheveled on her head, kind of standing up in parts."
> There was also change scattered across the floor of the laundry room. Kimberly
> and her husband took B.B. back to her aunt's apartment and then returned to the
> laundry mat. Upon returning, Kimberly noticed a puddle of urine on the floor and
> wiped it up with a pair of panties she found on the floor of the laundry room.

*    *    *

> In the present case, both Kimberly and her husband, Jimmy, identified the
> appellant from a pre-trial photographic array, and again at trial, as the same
> person who was exiting the laundry room immediately after B.B. was sexually

---

[2] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v.
Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

4

assaulted. No other person was observed in the laundry room or in the immediate vicinity of the victim. The victim's aunt testified that B.B. returned to her apartment "hysterical" and had urinated on herself. Such testimony corroborates both the victim's testimony and the testimony of Kimberly and Jimmy. B.B. immediately told her aunt that "that man had tried to kill her" and subsequently explained that he had touched her private parts.

Additionally, the description of the rapist's car matched the vehicle driven by the appellant. Both Kimberly and Jimmy testified that a young blond-headed boy was in the rapist's car when they arrived at the laundry room. At the time of the incident, the appellant had a child of like description and age. Although the appellant had somewhat changed his appearance at the time of trial, the physical appearance of the appellant also matched the descriptions given by B.B. and the other witnesses as that of the rapist.

State v. Tanksley, 2000 WL 1521475, *1-2, 3. The state appellate courts' other factual findings are set forth in the context of Petitioner's claims.

### 3. Conclusions of Law

This claim is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### a. Ineffective Assistance of Counsel

Petitioner has multiple claims about his trial counsel: (1) that his counsel failed to move to suppress certain evidence; (2) that his counsel failed to advise adequately so that Petitioner could make a knowing and intelligent decision on whether to accept the State's ten-year plea

offer; (3) that his counsel failed to ascertain that juror Tammy Jones had knowledge of or access

to the petitioner's criminal record and remove her from the jury; (4) counsel failed to challenge

the victim's capacity to be a witness; (5) that his counsel failed to present certain alibi evidence;

(6) that his trial counsel failed to introduce proof of the non-identification of him by a witness;

(7) that his counsel failed to present Jerry Dean as an alternative suspect; (8) that his trial counsel

failed to present evidence that Petitioner had a foot injury and walked with a limp; (9) that his

trial counsel failed to present expert testimony as to the lack of physical injury to the victim's

genitals; (10) that his trial counsel improperly told the jury during closing argument that

Petitioner faced years imprisonment when Petitioner actually faced consecutive sentences of life

without parole; (11) that his trial counsel failed to request a lesser included offense instruction;

(12) that his trial counsel failed to provide adequate assistance at Petitioner's sentencing; and

(13) that his trial counsel failed to challenge the application of enhancing factors and the repeat

violent offender law due to lack of notice, lack of applicability, and lack of evidence.

In Petitioner's state post-conviction appeal, the Tennessee Court of Criminal Appeals

made the following factual findings:

> At the hearing, the petitioner claimed he received the ineffective assistance of
> counsel. The petitioner testified that he asked his trial counsel to relitigate the
> issue of whether the photographic lineup was unduly suggestive because he was
> the only suspect who had a ponytail. As the petitioner explained, his previous
> counsel from the Public Defender's Office had filed a suppression motion on this
> issue, which had been heard and ruled upon. Subsequently, however, his case was
> transferred to another judge, and he asked counsel to petition the new judge to
> reconsider the issue. The petitioner asserted that counsel failed to file a second
> suppression motion though the petitioner conceded that counsel raised the issue
> orally pretrial. The petitioner also asserted that he told counsel repeatedly to raise
> the issue on appeal. The petitioner further claimed that counsel failed to file a
> motion to suppress the women's undergarments seized though the petitioner
> acknowledged that the record reflected some discussion of scheduling a hearing

on the motion. Nonetheless, the petitioner asserted that he did not recall any hearing on a motion to suppress the undergarments seized.

The petitioner testified that he sent counsel a letter containing a list of witnesses and their contact information, but counsel failed to investigate these witnesses. In particular, the petitioner said Jerry McCrory was a material witness regarding the suppression of the photographic lineup, and he discussed with counsel the possibility of subpoenaing Mr. McCrory to testify at trial. The petitioner claimed that Mr. McCrory would testify that he saw an adult leaving the laundry room but was unable to positively identify the petitioner in the photographic lineup. The petitioner recalled that counsel told him that Mr. McCrory could not be located for trial. The petitioner also claimed that he had requested counsel obtain funds for the purpose of deposing his alibi witness, Vicki Ogden, who lived in Las Vegas, but counsel never took her deposition. The petitioner further claimed that counsel never contacted George Lake, the petitioner's former employer, or James Gully, his father-in-law prior to trial. Had counsel contacted these witnesses before trial, counsel could have brought out the fact that the petitioner limped due to a foot injury. In addition, had counsel interviewed his wife, counsel could have brought out the fact that the women's undergarments were to be donated to Goodwill.

The petitioner testified that counsel told him to clean up so he shaved off his beard and left his mustache. However, the petitioner complained that at trial the prosecutor implied that he was attempting to alter his appearance and trick the jury. Therefore, the petitioner blamed counsel for not advising him on how to clean up for trial. The petitioner also stated that although counsel mentioned lesser-included offenses to him, counsel did not explain them. The petitioner further asserted that after the trial court denied instructions on lesser-included offenses, counsel failed to object to the court's denial and did not bring the issue up on appeal.

The petitioner claimed that he asked counsel to challenge the victim's capacity to testify at trial but counsel shrugged off his request. The petitioner stated that at trial, counsel did not object when the court initially instructed the jury that the petitioner faced fifteen to sixty years for the rape of a child when in fact this conviction required a life sentence without parole. However, the petitioner acknowledged that the court later amended the jury charge to reflect that the petitioner was facing a sentence of "fifteen years to life." Nonetheless, the petitioner argued that it was "the percentage and release eligibility that the jury must be informed of." The petitioner asserted that he had reservations regarding a juror because he thought she worked for the Tennessee Department of Correction (TDOC). However, he was not sure, therefore, he agreed with counsel to let the

juror serve on the jury. Only after the trial did he learn that the juror worked for TDOC.

According to the petitioner, counsel failed to argue at sentencing that the petitioner's prior convictions for robbery with a deadly weapon should not be considered under the three-strikes law. The petitioner stated that his previous attorney from the Public Defender's Office had previously made this argument at a pretrial hearing. However, counsel did not. Instead, counsel "screamed up and down about the violation of the time for filing [-] the forty-five day rule, [and] the hundred and eighty-day rule." The petitioner further asserted that he wanted this issue included in his appellate brief but counsel refused to include it.

On cross-examination, the petitioner acknowledged that counsel did communicate with him via telephone and letters. The petitioner also acknowledged that at trial his father-in-law testified as to his injury which caused him to limp.

Steve Allen, a criminal investigator with the Public Defender's Officer, testified that he interviewed Mr. McCrory on two occasions and these interviews were transcribed. During the interviews, Mr. McCrory stated that he saw an individual leave the laundry room on the day in question, but he was later unable to positively identify that person when shown a photographic lineup. However, Mr. McCrory did not specify the time he saw the individual exiting the laundry room.

Lisa Tanksley, the petitioner's wife, testified that on the day of the crime, she had a telephone conversation with the petitioner. During this conversation, the petitioner told her that he planned to meet a client after lunch to work on her computer. Mrs. Tanksley stated that counsel never asked her about this conversation. Mrs. Tanksley also said that both her young children were with the petitioner on the day of the crime. Mrs. Tanksley stated that she gave counsel a written contract resulting from the petitioner's work on the day of the crime and a Wal-Mart receipt.

George Lake, the petitioner's former employer, testified that he met with counsel once to discuss his trial testimony and the meeting place was the hallway outside the courtroom right before trial. Mr. Lake recalled that on May 6, 1995, the petitioner was off work but came into the store in the early morning with his two sons. After the petitioner left, Mr. Lake did not see the petitioner the rest of the day. Calvin Tanksley III, the petitioner's son, testified that he and his brother were with the petitioner when he stopped at the laundry room around lunchtime on May 6, 1995. He and his brother stayed in the car while the petitioner ran into the laundry room. Calvin could not recall if he was interviewed by counsel.

Counsel testified that he took the petitioner's case from the Public Defender's Office after being appointed. He recalled that he had extensive discussions with the petitioner about the case prior to trial. In particular, counsel recalled discussing potential witnesses for petitioner's defense. Counsel stated that the suppression of the photographic lineup was litigated before he took the case. Counsel did not recall the petitioner ever discussing the lineup suppression hearing and the fact that he wanted the issue raised on appeal. Counsel said that he did not raise the lineup suppression issue on appeal because he did not believe the issue had any merit. Counsel asserted that he filed a motion to suppress when the state attempted to admit into evidence three grocery sacks full of women's undergarments.

With regard to the petitioner's alibi, counsel testified that he and the petitioner spoke with Mrs. Ogden via telephone. Mrs. Ogden represented the fact that she was with the petitioner in Hendersonville around the time of the crime. However, counsel chose not to call Mrs. Odgen as an alibi witness because the trial court had ruled earlier that it would let in evidence of a similar conviction, regarded by the court as a "signature crime." Counsel noted that the petitioner had apparently pled guilty to a crime with "almost identical" facts.

With regard to other defense witnesses, counsel testified that he interviewed or read the statement of every witness that testified at trial. Counsel recalled that he interviewed Mr. Lake via telephone, and spoke with Mrs. Tanksley about her testimony on several occasions. Counsel also recalled that he attempted to contact Mr. McCrory but could not reach him. However, counsel noted that he read Mr. McCrory's interviews with the Public Defender's Office. Counsel asserted that Mr. McCrory's testimony was not relevant because Mr. McCrory had not made a positive identification of the individual seen coming from the laundry room. Counsel further asserted that he did not call Calvin Tanksley III, the petitioner's son, to testify at trial because counsel did not want to bolster the testimony of two eyewitnesses, who saw the petitioner exit the laundry room and drive off in a car containing a boy matching the description of the petitioner's son.

Counsel testified that he never told the petitioner to alter his appearance by cutting his ponytail or removing his mustache. Counsel recalled that he did tell the petitioner to shave and look good for trial. Counsel noted that the petitioner told him about having "ingrown toenails," but counsel did not recall the petitioner walking with a limp. Counsel stated that the petitioner never told him to request lesser-included offenses, and he did not recall requesting any special instructions at trial. Counsel said he believed that asking for instructions on lesser-included offenses robbed the defense of credibility as the theory of defense was that the petitioner "wasn't there, [and] didn't do it." Counsel also noted that he requested

funding for investigative services but never utilized the funds because he found no need for the services.

Counsel testified that he requested an opportunity to interview the victim prior to trial but was not afforded the opportunity. However, he was provided with the *Jencks* statements of the eyewitnesses prior to trial. Counsel stated that he did not challenge the victim's capacity to testify. He explained:

The testimony at trial was quite disturbing.... [The victim] could not make a verbal response in court. She had to write on a legal pad. And, I believe, Ms. Ramsey took the legal pad, and [the trial judge] did the question and answer at trial. So, once the [trial judge] made the determination she was competent to testify[,] I did not challenge that. In fact, [the victim] did not make an in-court identification of [the petitioner] and I did not even cross-examine her based on that fact.

Counsel also testified that, during voir dire, he learned that a juror worked at TDOC. According to counsel, he wanted to recuse the juror, but the petitioner wanted to keep her because he thought he and the juror had made eye contact. Later, after the Tennessee Supreme Court had denied certiorari of the direct appeal, counsel heard allegations that this juror had accessed the petitioner's criminal record and had communicated this record to other jurors. Based on this information, counsel recommended that the petitioner file a petition for writ of error coram nobis. Counsel further testified that the issue of whether the three-strikes law applied to the petitioner was litigated by the Public Defender's Office prior to his representation of the petitioner.

Counsel recalled that he reviewed the indictment with the petitioner. Counsel noted that the original indictment in November 1995 was replaced by a superceding indictment in July 1996. Counsel also noted that he did not receive the petitioner's case until after the indictment and discovery phases were complete. Counsel acknowledged that he did not file anything challenging the indictment.

Counsel recalled that there was an issue concerning the jury charge which resulted in a bench conference. However, counsel could not recall if the issue related to the range of punishment or not. Counsel acknowledged the fact that the defense could not advance its alibi theory, "gutted the case." However, counsel recalled that the victim was unable to make a positive in-court identification of the petitioner, therefore, counsel suggested to the petitioner that the defense rest its case. However, the petitioner did not want to do this so the defense put on proof. Counsel stated that he believed his preparation and strategy of showing the inconsistencies in the eyewitnesses' testimony was the best he could do under the circumstances.

On cross-examination, counsel acknowledged that the state offered proof that the victim had previously identified the petitioner in a photographic lineup. Counsel also acknowledged that two of the eyewitnesses tentatively identified the petitioner in-court as the individual who left the laundry room.

Tankesly, 2007 WL 1890208 at 1-5.

## 1.  Failure to File a Motion to Suppress

As to the disposition of Petitioner's specific claim on counsel's failure to file a motion to suppress, the State appellate court found as follows:

The petitioner next claims that counsel was ineffective in failing to file a motion to suppress 400 pairs of women's undergarments found at the petitioner's residence and seized by police. Contrary to the petitioner's claim, however, the record indicates that counsel did in fact file a motion to suppress. As the post-conviction court found:

> **[F]rom the transcripts of the proceedings, it appears as though trial counsel did in fact argue to have the undergarments suppressed at a hearing on December 4, 1997. [Counsel] actually filed a motion to suppress this particular evidence based on the grounds that the search warrant was defective, but ... it was denied.**

> **In addition, <u>on direct appeal, this court found the introduction of the women's undergarments to be harmless error. *See Tanksley,* 2000 WL 1521475 at \*7. Accordingly, it is abundantly clear that the petitioner has failed to prove either deficient performance or prejudice resulting from counsel's representation of this issue. The issue is without merit.</u>**

Tanksley, 2007 WL 1890208 at \*10 (emphasis added).

To establish ineffective assistance of counsel, petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice.  Strickland v. Washington, 466  U.S. 668, 695 (1984).  As the Supreme Court has explained:

12

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not Functioning as the 'counsel' guaranteed the defendant by the sixth amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Id. 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691. As to the duty to investigate:

> These standards require no special amplification in order to define counsel's duty to investigate, the duty at issue in this case. As the court of appeals concluded, strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper

assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 690-91.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be highly deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691. As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Id. at 691 (emphasis added). Counsel's failure "to conduct constitutionally adequate pretrial investigation into potential evidence" can "hamper[] [their] ability to make strategic choices." Harries v. Bell, 417 F.3d 631, 639 (6th Cir. 2005). A court must examine not only to the individual errors of counsel, but must also view the effect of the errors cumulatively. See Draper v. Adams, 215 F.3d 1325, 2000wl712376 *3 (6th Cir. May 23, 2000).

To establish prejudice due to his counsel's errors or omissions, petitioner must establish a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Williams, 529 U.S. at 390-91. In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694.

The Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As the Sixth Circuit explained:

> In Cronic[1], the supreme court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams[2], the supreme court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed." We have recently applied the presumption-of-prejudice test to a claim of ineffective assistance of counsel.

Mitchell v. Mason, 325 f.3d 732, 740 (6th Cir. 2003)(citations and parenthetical omitted).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. At 1851 (quoting Cronic, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could not render assistance.

Id. at 742. Petitioner's claim does not fall within any of these categories and thus, a "strong presumption" arises that petitioner's counsel provided reasonably effective assistance.

Strickland, 466 U.S. at 689.

---

[1] United States v. Cronic, 466 U.S. 648 (1984).

[2] Williams v. Taylor, 529 U.S. 362 (2000).

As these principles apply here, Petitioner's counsel in fact challenged the admission of this evidence. As to any omission to present the issue on direct appeal, the State appellate court addressed the admission of this evidence, but deemed its admission to be harmless error. Tanksley, 2000 WL 1521475 at *7. Thus, this suppression issue was raised at trial and on direct appeal. The Court cannot discern any prejudice to Petitioner on this aspect of his counsel's performance. Thus, the state courts' decision on this claim was a reasonable application of federal law.

On this suppression issue, Petitioner asserts a related Fourth Amendment claim that was not presented to the courts, challenging the seizure of this evidence. This claim cannot be ground for habeas relief, given the state courts' rulings on this claim. Stone v. Powell, 428 U.S. 465 (1976). Petitioner also assert a related Fourteenth Amendment claim on the introduction of the evidence, but to consider that claim would circumvent Stone.

### 2. Trial Counsel's Failure to Advise Fully Petitioner as to State's Plea Offer

Petitioner asserts that that his trial counsel failed to provide him the necessary information to make a knowing and intelligent decision on the State's offer of a ten-year plea agreement after the victim was unable to identify him positively at trial and that counsel failed to inform him that the State would seek to enter the women's undergarments into evidence. This claim was not presented to the state courts on direct appeal or in the state post-conviction proceedings and is procedurally defaulted.

### 3. Failure to Challenge Juror Tammy Jones and to Remove Her as a Juror

In denying the petition for writ of error coram nobis on Petitioner's juror misconduct claim, the State appellate court found as follows:

The record in this case reveals that the petitioner first learned of the alleged juror misconduct sometime in the year 2000, while his case was still pending in this court on direct appeal. He could, therefore, have raised the claim of having been denied his constitutional right to a fair and impartial jury, as well as the claim that trial counsel was ineffective for failing to take any action in pursuit of that claim, in a petition for post-conviction relief. Since he apparently failed to do so, he, like the petitioner in Freshwater v. State, 160 S.W.3d 548 (Tenn.Crim.App.2004), has waived that claim.

We also agree with the State that, even if not waived, the evidence presented at the evidentiary hearing did not support the petitioner's allegations of juror misconduct. Although the petitioner presented evidence that Ms. Jones may have later bragged to others that she had accessed and shared the petitioner's criminal record with her fellow jurors, none of the jurors who testified corroborated that claim. As the trial court observed, seven of the nine jurors who testified stated that they were not exposed to any information about the petitioner's criminal record or incarceration prior to rendering their verdicts. Mr. Gillespie, the only juror who testified he heard Ms. Jones make any extraneous comment about the petitioner, stated that she said only that she knew the petitioner was in prison, that the comment was made in passing at the end of the table after deliberations were completed, and that the jury did not resume deliberations or change its verdict in any fashion as a result of the information. Ms. Jones denied that she ever pulled the petitioner's criminal record and stated that she could not have done so because she had no access to the computer system where the records were stored. She further testified that she did not remember having said anything to her fellow jurors about her belief, based on her recognition of the transportation officers, that the petitioner was in jail and that she knew it would cause complications with the jury if she spoke of it. Thus, the key testimony of the jurors failed to show that the jurors were exposed to any extraneous information about the petitioner's prior record or current incarceration during their deliberations.

Tankesly, 2005 WL 2008203, at *7.

On post-conviction appeal, addressing Petitioner's ineffective assistance of counsel claim

for failure to challenge juror Jones, the State appellate court concluded:

The petitioner next claims that counsel was ineffective in failing to ascertain that Juror Jones had knowledge of or access to the petitioner's criminal record. The post-conviction court found:

The petitioner previously addressed this issue in his Petition for Writ of Error Coram Nobis which was heard and ruled upon by this Court. When questioned about the matter of juror Jones at the evidentiary hearing.... [Counsel] testified that he told the petitioner that he did not want Ms. Jones on the jury but that the

petitioner told him that he had some sort of eye contact with her and wanted her to remain. The petitioner testified .... that he told [counsel] that he did not want her on the jury but that [c]ounsel commented on who was left in the pool from which to choose. The petitioner went on to say that ultimately they both agreed to keep Ms. Jones on the jury because she seemed as though she would be a better juror than some of the other possible jurors who remained in the pool.

Ms. Jones testified at the hearing on the Petition for Writ of Error Coram Nobis that she did not access the petitioner's records while she served on the jury. However, she presumed he was incarcerated due to the fact that she recognized the transportation guards who were present with the petitioner at all times in the courtroom during the trial.

The credibility and weight of witnesses' testimony is to be resolved by the post-conviction court.... The petitioner is a convicted felon with an extensive criminal record, which detrimentally affects his credibility as a witness. On the other hand, [counsel] is a well-respected defense attorney, which tends to add weight to his credibility. Assuming that the petitioner's testimony is closer to the truth, it still falls short of proving that counsel's representation was insufficient in failing to challenge Ms. Jones and prevent her from serving on the jury. Nowhere in her testimony does Ms. Jones ever assert that her suspicion of the petitioner's incarceration during the trial affected her deliberation and agreement with the other jurors that the petitioner was guilty of the offenses. Moreover, the petitioner stated that he and [counsel] ultimately agreed that they should keep Ms. Jones on the jury....

Again, we conclude that the record does not preponderate against the findings of the post-conviction court. Moreover, we note that on appeal from the petitioner's petition for writ of error coram nobis, we determined that "the key testimony of the jurors failed to show that the jurors were exposed to any extraneous information about the petitioner's prior record or current incarceration during their deliberations." Tankesly, 2005 WL 2008203 at *7. Therefore, the petitioner failed to prove he was prejudiced by any alleged deficiency of counsel. The issue is without merit.

Tankesly, 2007 WL 1890208, at *14-15.

Petitioner admitted that he and his counsel discussed Jones's inclusion on the jury and that both of them agreed to keep her. The record reveals that the jurors were not exposed to information concerning Petitioner's record or incarceration during deliberations. Applying

<u>Strickland</u> the Court cannot discern any prejudice to Petitioner on this aspect of his counsel's performance.

As to Petitioner's separate claim that a juror engaged in misconduct in violation of the Sixth and Fourteenth Amendment, there has not been a showing of a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993). Petitioner fails to show that the state courts' decision was contrary to federal law.

### 4. Counsel's Failure to Challenge Victim's Capacity to be a Witness

Petitioner asserts that counsel was ineffective for failing to challenge the victim's capacity to be a witness to testify at trial. The State appellate court found as follows:

> The petitioner next complains that counsel was ineffective for not challenging the capacity of the eight-year-old victim to testify at trial. The petitioner cites <u>Ball v. State</u>, 219 S.W.2d 166 (Tenn.1949) for the proposition that children under age fourteen are presumed to be incompetent to testify. However, we note that Tennessee Rule of Evidence 601 expressly states that "[e]very person is presumed competent to be a witness except as otherwise provided in these rules or by statue." As the advisory comments to Rule 601 explain, the proposition announced in <u>Ball</u> is contra to Rule 601 and no longer applies. <u>Id</u>. Moreover, there exists no evidence that the victim was incompetent to testify. As the post-conviction court found:

>> At the trial in this matter, both this Court and the State questioned the victim as to whether she understood ... how important it was to testify truthfully under oath. She said she understood that if she did not tell the truth that she would get in trouble.... The victim, who was one month short of being nine years old at the time of the trial, was obviously competent to testify accurately and honestly. To call into question the victim's capacity to testify would have proven unsuccessful and [counsel] cannot be faulted for not doing so.

> The record does not preponderate against the findings of the post-conviction court. Likewise, we find no reason to second-guess the legitimate strategic decision of counsel. The issue is without merit.

<u>Tankesly</u>, 2007 WL 1890208, at *12-13.

Applying state law, the trial court made a determination that the victim was competent to testify. Petitioner's counsel testified that the victim could not make a verbal response in court and that she did not make an in-court identification of Petitioner. Under <u>Strickland</u>, this strategic decision of defense counsel not to challenge the victim's capacity to testify is not ground for habeas relief. Petitioner has not shown prejudice.

### 5. Counsel's Failure to Present Certain Alibi Evidence

Petitioner asserts that counsel failed to investigate and present evidence establishing that at the time of the offense he was working on a computer owned by, and in the company of, Vickie Ogden. The Tennessee Court of Criminal Appeals stated:

> The petitioner next complains that counsel was ineffective in abandoning his alibi defense at trial. At the post-conviction hearing, the petitioner alleged he was with Vickie Ogden on May 6, 1995, during the time the six-year-old victim was sexually assaulted. However, the record reflects that counsel sought to employ the petitioner's alibi defense at trial but made a strategic decision to abandon it after the trial judge ruled against the defense in a 404(b) evidentiary hearing. At the hearing, the trial judge ruled that the use of an alibi would place petitioner's identity at issue; therefore, the petitioner's prior bad acts of sexual assault of children would be admissible as "signature crimes" to prove the petitioner's identity. On direct appeal, this court found the judge's ruling correct. As the post-conviction court aptly put:
>
>> Unfortunately, the petitioner already had a history of committing acts so similar to this one.... Each of the three episodes, including this one, occurred within a three week period in an apartment complex with female victims between the ages of three and six years old, with the petitioner promising the victims something just before committing the acts. Had [counsel] presented Ms. Ogden's alibi testimony, [the petitioner's prior] acts would have become known to the jury, probably proving to be overwhelmingly detrimental to the defense. It is not the Court's function to " 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.' " <u>Henley v. State</u>, 960 S.W.2d 572, 579 (Tenn.1997) (quoting <u>Hellard v. State</u>, 629 S.W.2d 4, 9 (Tenn.1982)). [Counsel's] decision to not present the alibi defense was indeed prudent, [nonetheless], the existing evidence against the petitioner was almost certainly insurmountable.

Likewise, we will not second-guess the legitimate strategic decision of counsel. Again, the record does not preponderate against the post-conviction court's findings, and the issue is without merit.

Tankesly, 2007 WL 1890208, at *9.

Ogden's alibi testimony would have resulted in the introduction of Petitioner's prior bad acts, evidence that would have been very detrimental to Petitioner. Petitioner fails under Strickland to show that counsel's strategic decision to forgo presenting Ogden's testimony was deficient and that Petitioner was prejudiced as result.

Moreover, Petitioner fails to show that the state court's determination, Tankesly, 2000 WL 1521475, at *4-5, that if Petitioner introduced an alibi defense the state could then introduce evidence of Petitioner's prior bad acts, violated federal law or was an unreasonable determination of the facts by the state courts. Mere error in applying state law is not cognizable in a federal habeas proceeding. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

### 6. Trial Counsel's Failure to Develop Proof

Petitioner's next claim is that his trial counsel failed to secure the trial testimony of Jerry McCrory, a witness who after being shown a photographic array, purportedly could not identify Petitioner as the person exiting the laundry after the tragic event. Petitioner extrapolates that investigation of this witness would have led to the defense counsel to assert that Mr. Dean, another suspect, actually committed the rape. The State appellate court ruled as follows on this claim:

21

The petitioner's claim that counsel was ineffective for "failing to interview, develop or subpoena Jerry McCrory to testify at trial" also fails. Apparently, in making this claim, the petitioner relies on Mr. Allen's testimony that Mr. McCrory said he was unable to positively identify the person he saw at the laundry room. However, regarding any deficiency in counsel's representation, the record reflects that Mr. Allen, a criminal investigator for the defense, interviewed Mr. McCrory on two occasions and these interviews were submitted to counsel. The record also reflects that counsel attempted to contact Mr. McCrory at the petitioner's request but was unable to do so. Thus, we fail to see how counsel was deficient in this regard. Additionally, with regard to prejudice, no evidence was presented that Mr. McCrory was at the laundry room the same time the crimes took place, and petitioner did not present Mr. McCrory to testify otherwise. As a general rule, "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Tankesly, 2007 WL 1890208 at *8 (emphasis added).

The state trial court also made factual findings on this issue about the defense

investigator's testimony:

"[Allan] said that although Mr. McCrory told the police that he saw a man leave the laundry room at the apartment complex, he could not give a definite time frame of when he saw the person. Therefore it is possible that Mr. McCroy may not have seen the perpetrator.

Apparently, Mr. Allen attempted to contact M. McCrory at work several times, but Mr. McCrory was both elusive and evasive. Upon reading the transcripts of the conversations (exhibit #1), McCrory was very uncertain as to whether he could identify the petitioner in a photograph lineup. He admitted that he could not positively identify anyone, but that there was one man in the photographs that resembled the man he had seen exit the laundry room on the date of the incident. Mr. McCrory sounded extremely apprehensive about answering any of Mr. Allen's questions and told him that he would prefer to talk to the District Attorney's Office before answering any more questions. **However, towards the end of the conversation during the third phone call made by Mr. Allen, Mr. McCrory stated "[t]he person was in the photo spread, but … you know … from the photo that I identified I would have to … you know … identify that person to … you know … yes…. In fact, had [McCrory] been interviewed**

22

**and ultimately subpoenaed for trial, it seems as though Mr. McCrory would have identified the petitioner as the man he had seen at the apartment complex on May 6, 1995."**

(Docket Entry No. 30-31 at 83)(quoting Exhibit 1) (with emphasis added).

With these factual findings and the lack of proof by McCory at the post-conviction hearing, the Court concludes that the state courts reasonably applied federal law in rejecting this claim.  In any event, given the Gilkesons' identification of the Petitioner, his son and his vehicle near the scene of the rape and shortly after the tragic event, the Court deems the admission of this evidence is not grounds for habeas relief.  See Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994); Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988).

Petitioner's related claim about counsel's failure to pursue Mr. Dean as the perpetrator was not presented to the state courts on direct appeal nor in the state post-conviction proceedings and is procedurally defaulted.  In any event, Petitioner has not presented any proof for his theory about Dean's presence at his job site, nor the rape scene.  The state record reflects Dean was at work at the time of the crime and did not have a vehicle as described by the Gilkesons.  (Docket Entry No. 30-7 at 10, 24).  These related claims lack merit.

### 7.  Counsel's Failure to Present Evidence Petitioner Walked With a Limp

Petitioner asserts that counsel failed to present evidence that, at the time of the offense, Petitioner walked with a limp due to a foot injury.  The Tennessee Court of Criminal Appeals found:

> The petitioner next claims that counsel failed to investigate and assert a distinctive defense theory that the petitioner walked with a pronounced limp at the time of the offense. However, the petitioner fails to support his claim with any legal citation to authority and the issue is waived. See Tenn. Ct.Crim.App. R. 10(b); Tenn. R.App. P. 27(a)(7). Furthermore, the record does not support this claim. At the post-conviction hearing, the petitioner

23

admitted that his father-in-law testified at trial about the petitioner's foot injury. Additionally, the trial transcript reveals that the jury heard this so-called "distinctive defense theory" via the testimony of other defense witnesses. The record reflects that defense witnesses George Lake and James Gully both testified at trial that the petitioner had a foot injury and wore sandals. Accordingly, we conclude that the petitioner failed to prove deficient conduct or prejudice. The issue is without merit.

Tankesly, 2007 WL 1890208, at *11.

Petitioner fails to show that he was prejudiced as testimony concerning his foot injury was presented at trial. Accordingly, this claim is without merit.

### 8. Petitioner's Counsel's Sentencing Performance

Petitioner's next claim arises from his trial counsel's erroneous closing argument that if convicted, Petitioner would serve only a period of years. Petitioner alleges that under Tennessee law upon conviction, as a repeat violent offender, Petitioner's sentence would be life without parole. Petitioner's actual claim in the state courts and the disposition of that claim were as follows:

> The petitioner next claims that counsel was ineffective for failing to object to an incorrect release eligibility date in the written jury charge. . . . At trial, the trial court instructed the jury that he would be eligible for release following a conviction of child rape after serving 5.73 years of his sentence, when in reality, a conviction of child rape mandates 100% service of sentence with no release eligibility.

Tanksley, 2007 WL 1890208 at *13.

Here, Petitioner's claim in this action is not the same claim that Petitioner raised in the state courts. As a factual matter, the state trial court's amended instruction informed the jury of a possible life sentence for the Petitioner that precludes any possible prejudice from Petitioner's allegations about his counsel on this claim.

24

Petitioner also asserts a separate claim that the trial court incorrectly instructed the jury regarding the sentencing range that would apply in the event of Petitioner's conviction. Given that the court's amended instruction informed the jury of a possible life sentence for the Petitioner, this claim also fails.

### 9. Counsel's Failure to Request a Lesser Included Offenses Instruction

For this claim, Petitioner contends that with the State's expert's testimony about lack of penetration of the victim, Petitioner's trial counsel should have requested a lesser offense instruction of aggravated sexual battery. The Tennessee appellate court found on this claim as follows:

> Counsel stated that the petitioner never told him to request lesser-included offenses, and he did not recall requesting any special instructions at trial. <u>Counsel said he believed that asking for instructions on lesser-included offenses robbed the defense of credibility as the theory of defense was that the petitioner "wasn't there, [and] didn't do it</u>."

<u>Tanksley</u>, 2007 WL 1890208 at *4 (emphasis added).

Under <u>Strickland</u>, this strategic decision of defense counsel is not ground for habeas relief. In any event, the state trial court transcript reveals that the doctor's actual evaluation revealed "digital genital contact and attempted fellatio." (Docket Entry No. 30-7 at 54). According to the doctor, a finger can cause a digital penetration without evidence of actual injury. <u>Id.</u> at 58. The Court concludes that given Petitioner's theory at trial and the relevant evidence, Petitioner's counsel made a strategic decision and Petitioner has not shown any prejudice. This claim lacks merit.

### 10. Counsel's Failure to Challenge Enhancing Factors

25

Petitioner's last ineffective assistance of counsel claim is that his trial counsel failed to

challenge the application of enhancing factors and the repeat violent offender law due to lack of

notice, lack of applicability, and lack of evidence. Petitioner only asserted before the post-

conviction court that counsel was ineffective in failing to argue that the petitioner's sentence as

a repeat violent offender was incorrect under Tennessee law. As to that claim, the Tennessee

Court of Criminal appeals concluded:

> The petitioner next claims that counsel was ineffective in failing to properly argue that the
> petitioner's sentence as a repeat violent offender was incorrect under Tennessee Code
> Annotated section 40-35-120. However, as previously determined on direct appeal, the
> petitioner was properly sentenced as a repeat violent offender. See Tanksley, 2000 WL
> 1521475 at *9. Pursuant to section 40-35-120(a), a defendant qualifies as a repeat violent
> offender if the defendant meets one of three separate criteria. To qualify, a defendant can
> meet the criteria found in either (a)(1) and (2); or (a)(3) and (4); or (a)(5) and (6). Only if the
> defendant qualifies under the criteria found in (a)(5) and (6) does the exception for robbery
> by use of a deadly weapon apply. On appeal, this court found that the petitioner qualified as
> a repeat violent offender under 40-35-120(a)(1) and (2) which provides no exception for
> robbery by use of a deadly weapon. Again, the petitioner fails to demonstrate either
> deficient performance or prejudice under Strickland. The issue is without merit.

Tankesly, 2007 WL 1890208, at *15.

As Petitioner's sentence as a violent offender was upheld by the state courts, Petitioner

fails to show prejudice under Strickland.

### b. Photographic Lineup

Petitioner's next claim is that the photographic array, from which the Gilkesons identified

Petitioner, was unduly suggestive as Petitioner was the only person on the photographic array

with a ponytail that was among the distinctive features of the perpetrator. Petitioner contends

that the state courts' finding is unsupported. The State appellate court ruled as follows:

> In the present case, the photographic array consisted of five photographs of men
> of like age. All five men had characteristics similar to what the witnesses had

26

previously described. All men had short hair on top and long hair in the back which was shoulder length or longer. Although the appellant argues he was the only person with a ponytail in the photograph, it is not clear from the photograph that the appellant's hair was in a ponytail. Additionally, the appellant correctly points out that his photograph is the lightest of the photographs on display, however, the color of all the photographs varied. The appellant also argues that his was the only mugshot. All identifying material, except the actual photos themselves, was blocked by a flap covering the photographic array. Moreover, all pictures did, in fact, appear to be mugshot-style pictures. The detective never suggested who the appellant might be to the witnesses when they viewed the photographs. Therefore, we find that the photographic display was not unconstitutionally suggestive.

Tanksley, 2000 WL 1521475, at *8.

From this Court's review of this photographic lineup, there are several individual photographs of men with long hair that is capable of a ponytail. To be sure, only one of the men had an actual ponytail, but the Gilkesons also identified Petitioner's vehicle and Petitioner's son inside the vehicle. These facts undermine that this photographic lineup prejudiced Petitioner's right to a fair trial or rendered his trial a fundamentally unfair conviction.

Accordingly, the Court concludes that there was "no substantial likelihood of misidentification." Neil v. Biggers, 409 U.S. 188, 201 (1972); Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Ledbetter v. Edwards, 35 F.3d 1062, 1071 (6th Cir. 1994); Mills v. Cason, 572 F.3d 246, 251 (6th Cir. 2009).

### c. State's Use of Perjured Testimony

This claim is predicated upon the testimony of Ron Carter, a police detective, that McCrory was unable to identify the assailant from the photographic array. Citing the defense, the actual testimony for the claim is hearsay testimony of Petitioner's investigator who reported on his interviews of McCory. (Docket Entry No. 30-32 at 6). Later, in response to a leading

question, the investigator reports that McCrory states that Petitioner did not resemble the man who came out of the laundry room. Yet, the investigator's actual testimony was that McCrory's identification of Petitioner was not definite. Petitioner's trial counsel evaluated McCrory's testimony as failing to make "a positive identification of the individual seen coming from the laundry room." Tanksley, 2007 WL 1890208, at *4. The Court concludes that this new claim is procedurally defaulted and the cited evidence is insufficient to establish prejudice to excuse that default.

**d. Improper Application of Enhancing Factors and the Repeat Violent Offender Law**

Petitioner asserts that the State did not give him proper notice of its intent to have him sentenced under the repeat violent offender statute, that the State failed to try him within 180 days of the indictment, and that the evidence was insufficient to support the trial court's enhancing factors. On direct appeal, the Tennessee Court of Criminal Appeals found:

B. 45-Day Rule

The appellant next contends that he should not have been sentenced as a repeat violent offender because the State failed to give notice of the appellant's status as a repeat offender within forty-five days of his arraignment. In response, the State argues that the appellant was properly sentenced and cites to State v. Dee W. Thompson, No. 01C01-9812-00490 (Tenn.Crim.App. at Nashville, Mar. 17, 2000), in support of its argument. Tenn.Code Ann. § 40-35-120(i)(2)(1997) provides:

The district attorney general shall file a statement with the court and the defense counsel within forty-five (45) days of the arraignment pursuant to Rule 10 of the Rules of Criminal Procedure that the defendant is a repeat violent offender ... If such notice is not filed within forty-five (45) days of such arraignment, the defendant shall be granted a continuance so that such defendant will have forty-five (45) days between receipt of notice and trial.

Under the Repeat Violent Offender Statute, or "three-strikes" statute, offenders convicted of specified violent offenses who have a record of certain proven predicate convictions qualify for an automatic sentence of life without parole, rather than the variable

sentencing under the usual statutory scheme of offender ranges and offense classes. <u>See</u> <u>State v. Dee W. Thompson</u>, No. 01C01-9812-00490; Tenn.Code Ann. § 40-35-120 (1997). The State is required to file with the court and the defense counsel a statement that indicates the defendant is a repeat violent offender within forty-five days of the arraignment. Tenn.Code Ann. § 40-35-120(i)(2)(1997). If the notice is not timely filed, the defendant shall be granted a continuance so that he has forty-five days between the date of notice and the date of trial. Id. If the State fails to comply with the notice requirements, the defendant is not entitled to release from custody or dismissal of the charges. Tenn.Code Ann. 40-35-120(i)(3).

In the present case, the appellant was originally arraigned on November 29, 1995. The State gave notice of the appellant's status as a repeat violent offender on February 14, 1996. Consequently, the State failed to file notice within forty-five days from the date of arraignment. The State acknowledges this untimeliness in its brief. The remedy, however, is not dismissal of the charges or the release of the appellant from custody, but rather the assurance that the appellant will receive forty-five days between notice and trial. Tenn.Code Ann. § 40-35-120(i)(2) & (i)(3) (1997). The appellant received notice on February 14, 1996, and his trial was held on December 7, 1997. Thus, the defendant received ample time to prepare after notice was given. Furthermore, the appellant has alleged no prejudice from the untimely delay. "A common thread in each of these cases is the focus on whether the defendant has been prejudiced by the state's defective or delayed notice." <u>State v. Dee W. Thompson</u>, No. 01C01-9812-00490. The defense itself admitted that they were "not claiming, under these facts, any ultimate prejudice." Consequently, this issue is without merit.

C. 180-Day Rule

The appellant next alleges that the State did not comply with the requirements set forth in Tenn.Code Ann. § 40-35-120(I)(1) because he was not brought to trial within one hundred eighty days of arraignment. Tenn.Code Ann. § 40-35-120(i)(1)(1997) provides:

> A charge as a repeat violent offender shall be tried within one hundred eighty (180) days of the arraignment on the indictment pursuant to Rule 10 of the Rules of Criminal Procedure unless delay is caused by: (A) The defendant; (B) An examination for competency; (C) A competency hearing; (D) An adjudication of incompetency for trial; (E) A continuance allowed after a court's determination of the defendant's physical incapacity for a trial; or (F) an interlocutory appeal. A continuance may be granted to any party, including the court, for good cause shown.

The appellant was arraigned on November 29, 1995, and tried on December 7, 1997. Thus, more than one hundred eighty days elapsed between arraignment and trial. Once again, however, the appellant alleges no prejudice from this delay. In State v. Dee W.

Thompson, No. 01C01-9812-00490, this Court concluded that the one hundred eighty day rule was not intended to "benefit a defendant," but merely was a mechanism whereby society could be assured of "swift and certain punishment." See State v. Wilcoxson, 772 S . W.2d 33 (Tenn.1989). Without a showing of prejudice, the appellant is entitled to no relief. Therefore, this issue is also without merit.

D. Consecutive Sentences

Finally, the appellant asserts that the two consecutive sentences he received were "redundant and excessive." The appellant, however, failed to cite any authority to support this position. Consequently, this issue is waived. Tenn.R.App.P. 27(a)(4)-(a)(7). The sentencing decision of the trial court is affirmed.

Tankesly, 2000 WL 1521475, at *9-11.

As to Petitioner's claims for failure to give proper notice and failure to try within 180 days of the indictment, the State courts applied state law in denying these claims. "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle, 502 U.S. at 67-68. Petitioner fails to show that the application of state law by the state courts was contrary to or involved an unreasonable application of clearly established federal law or that the decisions were based on an unreasonable determination of the facts in light of the evidence presented.

As to Petitioner's insufficiency of the evidence claim, this claim was not presented to the state courts and is, thus, barred.

### e. Prosecutor's Vouching

The final claim is that in closing argument, the prosecutor vouched for the victim's credibility. From the Court's review of the state record, this claim was not presented on direct appeal, Tanksley, 2000 WL 1521475, at *1, nor on post-conviction Tanksley, 2007 WL 1890208, at *1.

In any event, given the testimony of the victim, the Gilkesons' testimony identifying Petitioner, his vehicle and child near the rape scene and the physician's testimony, the Court concludes this argument did not deprive Petitioner of a fair trial.

For these reasons, the petition for the writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _24th_ day of March, 2011.


WILLIAM J. HAYNES, JR.
United States District Judge